UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NADJA M. CHANDLER,

      Plaintiff,

v.                                         Case No.  3:17-cv-784-LC/MJF

NANCY A. BERRYHILL,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

This case is before this court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security denying Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-83.[1]

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence, and the decision of the Commissioner should be affirmed.

---

[1] This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.

## I.    Procedural History

On October 21, 2014, Plaintiff filed an application for Supplemental Security Income ("SSI"), and in the application, she alleged disability beginning January 1, 1995. (Tr. 17, 64, 161-69).[2] Her application was denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ"). On September 6, 2016, an ALJ conducted a hearing, and on November 10, 2016, the ALJ issued a decision in which she found that Plaintiff was "not disabled," as defined under the Act, at any time through the date of her decision. (Tr. 17-34). On October 2, 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

## II.    Findings of the ALJ

On November 10, 2016, the ALJ made several findings relative to the issues raised in this appeal:

1)    There is no evidence that Plaintiff engaged in substantial gainful activity since October 21, 2014.

---

[2] All references to "Tr." refer to the transcript of Social Security Administration record filed on January 3, 2018. (Doc. 4). The page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

2)      The Plaintiff has the following severe impairments: Diabetes Mellitus;
        status post right knee replacement; degenerative disc disease;
        schizoaffective disorder; and bipolar disorder.

3)      The Plaintiff does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of the
        listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4)      The Plaintiff has the residual functional capacity ("RFC") to perform
        medium work as defined in 20 C.F.R. § 416.967(c) with the following
        modifications:

        (a) she can occasionally push and pull leg controls and foot pedals on
            the right side;

        (b) she can occasionally stoop, kneel, crouch, crawl, balance, and climb
            ramps and stairs;

        (c) she is precluded from working at unprotected heights or climbing
            ropes, ladders, or scaffolding;

        (d) she is unable to work around moving mechanical parts;

        (e) she is unable to drive a motor vehicle;

        (f) she can perform simple routine repetitive tasks, but not at a
            production rate pace;

(g) she can occasionally respond appropriately to co-workers and supervisors, but can never respond appropriately to the general public;

(h) she can adapt to minimal changes in the work setting or routine (changes that could be explained in 5 to 10 minutes);

(i) she can make judgments on simple-work related decisions;

(j) she can maintain attention and concentration for up to two hours at a time; and

(k) she must work independently and not in a teamwork situation.

5)    The ALJ assigned great weight to the opinion of the State agent medical consultant, Dr. Barry Bercu, M.D., and the opinion of Dr. Ngoc Phan, D.O., regarding the claimant's physical capacities and limitations.

6)    The ALJ assigned partial weight to the opinions set out in the Supplemental Questionnaire as to Residual Functional Capacity completed by Advanced Registered Nurse Practitioner ("ARNP") Leif Sternung and Lakeview Center staff psychiatrist Dr. Guido Ludergnani, M.D.

7)    Plaintiff was 42 years old on the date she filed her application for SSI benefits.

8)     Plaintiff has no past relevant work; thus, transferability of job skills was not an issue.

9)     The Plaintiff has at least a high school education and is able to communicate in English.

10)    Considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(Tr. 17-34).

## III.    Standard of Review

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if, in light of the record as a whole, the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Lewis*, 125 F.3d at 1439; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "'such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Lewis*, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.    If the claimant is performing substantial gainful activity, she is not disabled.

2.    If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.    If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.    Plaintiff's Employment and Medical History

### A.    <u>Relevant Hearing Testimony</u>

Plaintiff testified that she was forty-four years old at the time of the hearing. She also testified that she had a high school education. (Tr. 47). She related that she had previously received Supplemental Security Benefits because of her schizoaffective disorder, but she lost them due to her incarceration for a charge relating to a vehicular accident in which her daughter and niece were killed. (Tr. 47). Plaintiff testified that she was not working and that she was "scared to leave her house." (Tr. 47).

Plaintiff also testified that she was currently being treated by Lakeview Center ("Lakeview") for medicine management. (Tr. 48). In response to the ALJ's question

about side effects from the medication, Plaintiff responded that her medications make her groggy and "real sick" and give her headaches. (Tr. 49).

In response to questions about her daily activity, Plaintiff stated that when she leaves her room she is scared and that she does not like being out in public. (Tr. 48). Although Plaintiff goes shopping for groceries every two weeks, she states she usually only gets about half of the items on her list because she has a panic attack. (Tr. 51). She related that her symptoms of seeing ghosts and interacting with the voices are not cured by the medication, but it keeps her head "out of the water" and keeps her out of the hospital. (Tr. 49, 53). Plaintiff testified that she has not required inpatient treatment since she was released from prison. Plaintiff also stated that not interacting with the ghosts causes her stress, but she can turn on her MP3 player to listen to music. (Tr. 55). Plaintiff testified that she normally sits in her room and watches television or plays computer games. She also maintained that she washes dishes and her clothes and takes care of her room. (Tr. 50). Plaintiff testified that she does not like anyone touching her belongings and that leads to her hiding things. (Tr. 53).

A vocational expert ("VE") also testified at the hearing and responded to three hypothetical questions posed by the ALJ and two posed by Plaintiff's counsel. The ALJ first asked the VE to consider an individual who had the following limitations due to mental impairments: (1) the individual could perform simple, routine,

repetitive tasks, but not at a production rate; (2) could occasionally respond appropriately to the general public and co-workers; (3) could adapt to minimal changes in the work setting or work routine, which would have to be explained in five to ten minutes; (4) could maintain attention and concentration for up to two hours at a time; and (5) would need to work independently and not with a team.

The ALJ's second hypothetical took the same facts and added the extra limitation that the individual could never respond appropriately to the general public but could occasionally respond to supervisors and co-workers. The last hypothetical required the VE to consider an individual who could never respond appropriately to co-workers or the general public. The hypotheticals put forth by Plaintiff's counsel required the VE to consider the limitations that the claimant: (1) would be distracted 20% of the work day; and (2) would be absent four days each month. In response to the ALJ's first two hypotheticals, the VE identified several occupations that Plaintiff could perform. (Tr. 56-59). The VE, however, stated that there were no jobs in the national economy that plaintiff could perform if she was never able to respond appropriately to co-workers. (Tr. 59). The VE also testified that if the individual was distracted 20% of the work day or absent four days each month, there would be no jobs in the national economy that she could perform. (Tr. 59-61).

**B.**    <u>**Relevant Medical and Psychological History**</u>

Plaintiff's medical records begin with a treatment note from the Lakeview Center ("Lakeview") dated February 25, 2010. (Tr. 934). The record reflects that Plaintiff suffered from mood changes and auditory hallucinations that were paranoid in nature. (Tr. 934-35). The Plaintiff was diagnosed with bipolar disorder with psychotic features and cannabis abuse. (Tr. 938). Plaintiff continued her treatment with Lakeview through 2011. In 2011, Plaintiff was diagnosed with schizoaffective disorder, cannabis dependence, adjustment disorder with mixed disturbances of emotion and conduct, and depressive disorder not otherwise specified ("NOS"). (Tr. 949). Plaintiff continued her treatment with Lakeview during her pre-trial release in the Acute Stabilization Unit ("ASU"), through an extended, involuntary inpatient admission. (Tr. 970).  Plaintiff received treatment through group therapy, substance abuse therapy, and supporting counseling. She also continued to receive treatment at Lakeview through a portion of her incarceration in 2011 and 2012.

Plaintiff also received mental health services while she was incarcerated. Santa Rosa County Jail records reflect that Plaintiff received medication for her mental health symptoms in 2011 and 2012. (Tr. 268-885). These records reflect that she reported hearing voices, experienced mood swings, but denied having visual hallucinations and paranoia. (Tr. 271). Plaintiff had suicidal ideations and increased paranoia after discontinuation of her medicine Depakote. (Tr. 283, 297, 658).

Plaintiff also received medical care during her time in prison from 2012-2014. (Tr. 917, 919, 921), In a Service Plan dated September 3, 2014, the counselor noted that Plaintiff reported experiencing symptoms of anxiety, depression, hallucinations, and paranoid ideations with nervousness, apprehension, rumination, sadness, and disrupted sleep. (Tr. 917, 918). Plaintiff denied having nightmares, flashbacks, or anxiety attacks. She also reported that she heard voices that told her what people were going to say before the person said it, and she heard people talk before they actually spoke.

On October 29, 2014, Plaintiff returned to Lakeview to re-establish psychiatric services at that facility. Plaintiff told the intake counselor that she experienced non-command auditory and visual hallucinations and recurrent depression from childhood. (Tr. 924). The intake counselor noted that Plaintiff did not report any suicidal ideations. (Tr. 924). Plaintiff stated she was "happy to be stable and out of prison" and was seeking to remain stable through medication. The counselor performing intake noted that "[Plaintiff] is appropriately dressed and groomed; eye contact is good and responses are spontaneous and coherent. She is alert and oriented. Attention and concentration are fair. Mood is good; affect is with appropriate range. [Plaintiff] is friendly and cooperative with the interview process." (Tr. 926).

Plaintiff was given a Global Assessment of Functioning ("GAF score") of 61. (Tr. 926). This score indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficult in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." (Tr. 29) (quoting Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32, 4th ed., 2000).

On December 9, 2014, Plaintiff met with ARNP Sternung for a psychological evaluation. At the assessment, she stated that she had a long history of unstable moods and behavior, which were made worse without her medication. (Tr. 1068). Plaintiff reported that she had a history of auditory and visual hallucinations, episodes of paranoia, and episodes of mania and depression. (Tr. 1068). Plaintiff informed ARNP Sternung that she was taking Tegretol and Trilafon but had the best benefits from Celexa and Abilify. (Tr. 1069). ARNP Sternung noted that the Plaintiff's thought processes were logical and linear, her memory was intact, and her insight and judgment were fair. (Tr. 1069). He also noted that her affect was depressed and flat. ARNP Sternung noted that Plaintiff did not exhibit psychotic symptoms or any suicidal or homicidal ideation. (Tr. 1069). ARNP Sternung assigned Plaintiff a GAF score of 61. (Tr. 29, 1070).

In a Functional Report completed by the Plaintiff in October 2014, she stated that she spent her days cleaning the house, reading, and listening to music. (Tr. 213). Plaintiff stated that she would go shopping twice a month for food and clothing, but that she tried to keep such outings short. In a response to a question regarding transportation, Plaintiff indicated that she used public transportation. (Tr. 215). Plaintiff also noted that she could leave her house by herself. (Tr. 215). Plaintiff listed reading, listening to music, and playing video games as hobbies. For social activity, she spent time with her cousin daily. (Tr. 216). Plaintiff noted that her medicine affected her memory and concentration. (Tr. 217). But in response to a question about written instructions, Plaintiff stated that her memory was not a concern. She related that verbal instructions were harder to remember. (Tr. 217).

In the Functional Report, she stated she did not generally get along well with those outside of her social group. Plaintiff noted that she followed directions from authority figures. (Tr. 218). She related that stress caused her to buckle easily and that she could not handle changes in routine. (Tr. 218). Plaintiff also noted that she was taking Tegretol, Celexa, and Trilafon. Plaintiff attributed her poor memory and grogginess to Tegretol and Trilafon. (Tr. 219).

Plaintiff also completed a Supplemental Questionnaire, in which she reported having 10 panic attacks in the past 6 months. (Tr. 195). Plaintiff indicated that these attacks were caused by stress, large crowds, and trauma. (Tr. 195). These panic

attacks lasted less than five minutes and were relieved by isolating herself, deep breathing, and taking medication. (Tr. 195). Plaintiff stated that the panic attacks caused her difficulty in being around others. (Tr. 196).

Plaintiff continued to receive treatment from Lakeview from January 20, 2015, through July 14, 2016. On a regular basis, Plaintiff received care for her schizoaffective disorder. During this time, Plaintiff's symptoms appeared to gradually improve.

On January 20, 2015, Plaintiff stated she was not doing well. She reported having many hallucinations, delusions, mood swings, and paranoia. In particular, Plaintiff reported that she was clairvoyant and knew when someone was coming to her house. Plaintiff had no complaints of side effects with her medication regimen. (Tr. 1096). ARNP Sternung noted that Plaintiff's speech was pressured and tangential, she was hypomanic. ARNP Sternung also noted that Plaintiff was alert and oriented and her insight and judgment were fair. (Tr. 1096). Plaintiff's GAF score was still assessed as a 61. (Tr. 1097). ARNP Sternung increased Plaintiff's dosage of Abilify to better address the Plaintiff's symptoms and continued treatment with Celexa. (Tr. 1097).

On February 3, 2015, Plaintiff reported some improvement. But she stated that she still had many mood swings, paranoia, and hallucinations. ARNP Sternung noted that Plaintiff answered questions logically, had fair insight and judgment, but

Plaintiff's affect was flat. Plaintiff requested to switch to Tegretol because she thought it helped manage her symptoms better. Plaintiff's GAF was still assessed as a 61. (Tr. 1100).

A progress note dated February 3, 2015, indicated that Plaintiff had no problem with her interpersonal relationship, no problem in her self-care, and only moderate problems with her anxiety and thought process rating.[3] (Tr. 1102).

On April 1, 2015, Plaintiff reported that the change to Tegretol had "a lot of benefits" for her. (Tr. 1104). Her only complaint was weight gain due to Abilify. Although Plaintiff reported having "some mood swings," she stated she was gradually improving. (Tr. 1104). Plaintiff did not report suicidal thoughts, hallucinations, or delusions. Plaintiff described her mood as being "good," but Plaintiff informed ARNP Sternung that she needed a larger dose of Tegretol. ARNP Sternung noted that Plaintiff answered questions logically and Plaintiff's insight and judgment were fair. (Tr. 1104). Plaintiff's affect was euthymic with a good range of expression.

On June 15, 2015, Plaintiff reported that she had mood swings, hallucinations, agitation, and irritability. But she felt she was benefitting from the medicine, which

---

[3] The evaluation contained in the progress note rates each of the categories described on a number scale along with an indication of "No Problem," "Less than Slight Problem," "Slight Problem, "Slight to Moderate Problem," and "Moderate Problem." The evaluation, however, does not indicate the scale on which these numbers or descriptions are assigned.

she reported did not entail any side effects. (Tr. 1118). ARNP Sternung noted that Plaintiff answered questions logically and had fair insight and judgment. (Tr. 1118). Plaintiff's bloodwork revealed that she was on the low end of the therapeutic range for Tegretol. Thus, the dosage was increased to two hundred milligrams twice per day.

On September 10, 2015, Plaintiff reported a decrease in paranoid thoughts and hallucinations. (Tr. 1120). She also reported a decrease in agitation and irritability. She stated she was able to handle stressors better on her medication. ARNP Sternung noted that: (1) Plaintiff's insight and judgment were fair; and (2) Plaintiff could answer questions logically. (Tr. 1120). ARNP Sternung also noted that Plaintiff described her mood as good, and Plaintiff's affect was euthymic with a good range of expression. To prevent a relapse in symptoms, ARNP Sternung recommended that Plaintiff continue her medication regimen of Tegretol, Abilify, and Celexa. (Tr. 1120). On November 30, 2015, Plaintiff related that she responds well to the medication. Although she had breakthrough symptoms, the medication reduces the symptoms to tolerable levels. (Tr. 1122). Plaintiff also reported that she had difficulty with taking her Abilify. Thus, ARNP Sternung recommended that Plaintiff receive an injection of Abilify monthly.

On December 7, 2015, Plaintiff, accompanied by an advocate, reported she was stressed about her living arrangements and felt unsafe. She reported no

hallucinations, delusions, or suicidal thought. (Tr. 1125). ARNP Sternung noted that Plaintiff answered questions logically, had fair insight and judgment, and had a linear and logical thought process. Plaintiff's mood was good, and her affect was euthymic with a good range of expression. (Tr. 1125). There were no observable signs of abnormal body movements or tics. ARNP Sternung also noted that Plaintiff's memory was intact. ARNP Sternung recommended continuation of the medication regime, including the monthly injections of Abilify. (Tr. 1126).

Plaintiff never complained of side effects during the period she received monthly injections of Abilify. (Tr. 1127, 1228, 1129, 1132, 1133, 1134). On March 7, 2016, Plaintiff reported no hallucinations, delusions, or paranoia. (Tr. 1130). She appeared to be baseline with her psychotropic medications and appeared alert and oriented to person, place, time and situation. Plaintiff was engaged in the interview. (Tr. 1130). ARNP Sternung observed that Plaintiff's thought content revealed no evidence of auditory or visual hallucinations, delusions, or paranoia, or loose associations, tangentiality or circumstantiality. (Tr. 1130). Plaintiff did not exhibit signs of psychomotor agitation or retardation. ARNP Sternung also noted that Plaintiff's speech was fluent and normal in rate, tone, and rhythm. Plaintiff's memory appeared to be grossly intact and her insight and judgment were intact and adequate. (Tr. 1130).

At her appointment on June 13, 2016, Plaintiff stated she had "some paranoia," but otherwise she had stable moods and behavior. (Tr. 1135). ARNP Sternung noted the same observations about the Plaintiff that he had at the March 7, 2016 appointment. (Tr. 1135). On July 14, 2016, Plaintiff did not report hallucinations, delusions, or paranoia. (Tr. 1128). Plaintiff stated that the she did well with the medication, but she suffered some nausea from the Latuda and also reported having sexual side effects from the Celexa. (Tr. 1138). ARNP Sternung made the same observations as those found at the March and June appointments. (Tr. 1138).

The record also contains a Supplemental Questionnaire as to the Residual Functional Capacity, which was co-signed by ARNP Sternung and Dr. Ludergnani. It is dated November 30, 2015. ARNP Sternung and Dr. Ludergnani indicated that Plaintiff has: (1) moderate restriction on activities of daily living, and marked difficulty in maintaining social functioning; (2) frequent deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; (3) marked episodes of deterioration or decompensation in work or work-like setting; (4) marked limitations in her ability to understand, carry out, and remember instructions; (5) marked limitations in her ability to respond appropriately to supervision and to co-workers in a work setting; and (6) marked limitations in performing simple and repetitive tasks in a work setting. They also

opined that she likely would be absent from work four or more days each month, and that she was disabled from full-time employment. (Tr. 1116-17).

Plaintiff also was seen for mental consultative evaluations by two state agency psychologists. On December 23, 2014, Dr. Lee Reback, Psy.D., found that the Plaintiff had mild restrictions on activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 72). In particular, Dr. Reback found that Plaintiff had no limitations on understanding or memory and was not significantly limited in her ability to carry out very short and simple instructions and detailed instructions. (Tr. 76).

With respect to limitations on Plaintiff's ability to maintain social functioning, concentration, persistence, or pace, Dr. Reback noted that Plaintiff had moderate limitations in working with others in close proximity without being distracted, distracting others, or exhibiting behavioral extremes. (Tr. 76-77). Dr. Reback also noted that Plaintiff had difficulty trusting others. (Tr. 77). Dr. Reback opined that plaintiff was able to avoid routine hazards, maintain safe behaviors, and follow rules. (Tr. 77). Dr. Reback noted that Plaintiff only had moderate limitations in her ability to adapt. Specifically, Dr. Reback found that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. (Tr. 77). Dr. Reback concluded that Plaintiff had the mental capacity to perform daily and routine

activities, but Plaintiff likely would do best in a stable work environment with limited interpersonal demands. (Tr. 78).

In a psychological evaluation report for the state agency dated April 3, 2015, Dr. James Brown, Ph.D., stated that Plaintiff suffered from the severe mental impairment of Affective Disorder, which caused Plaintiff mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 85). Dr. Brown affirmed Dr. Reback's opinions regarding Plaintiff's mental residual functional capacity. Dr. Brown concluded that Plaintiff would be able to perform daily and routine activities, but Dr. Brown advised that Plaintiff would perform best in a stable work environment with limited interpersonal demands. (Tr. 92).

## V.    Discussion

On appeal, Plaintiff argues that the ALJ's decision was not supported by substantial evidence when considering the record as a whole. Specifically, Plaintiff raises two issues. First, Plaintiff contends that the ALJ erred by improperly placing weight on the Plaintiff's ability to engage in daily activities in determining her residual functional capacity regarding her mental impairments. Second, Plaintiff alleges that the ALJ erred in discrediting the treatment notes signed by Dr. Guido Ludergnani and ARNP Sternung.

A.    **Plaintiff's Daily Activities**

Plaintiff contends that the ALJ erred in determining that the Plaintiff's daily activities were persuasive evidence that Plaintiff is not disabled.

The Eleventh Circuit has established a three-part standard for evaluating a claimant's testimony regarding his subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). This standard requires the Plaintiff to show: (1) evidence of an underlying medical condition; and either (2) objective medical evidence that confirms the severity of the alleged symptoms arising from that condition; or (3) that the objectively determined medical conditions is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *Id.* In deciding the issue of disability, the ALJ must consider "all evidence, including subjective statements about the intensity, persistence, and functionally limiting effects of pain [as well as] the objective medical evidence, laboratory findings and statements from treating or nontreating sources about how the symptoms affect the claimant." *Jarrell v. Comm'r of Soc. Sec.*, 433 F. App'x 812, 814 (11th Cir. 2011) (citing 20 C.F.R. § 404.1529(c)(4)); *Macia v. Bowen*, 829 F.2d 1009, 1111 (11th Cir. 1987).

Notably, "[i]f proof of disability is based upon subjective evidence and a credibility determination is, therefore, crucial to the decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount

to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (citation and quotation marks omitted); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) ("If the Commissioner refuses to credit" the subjective testimony of the Plaintiff concerning pain "he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted the testimony as true."); *Holt*, 921 F.2d at 1223. The reasons articulated by the ALJ must be based upon substantial evidence. *Jones v. Dep't. of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Foote*, 67 F.3d at 1562 ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court.").

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ determined that Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 31). In determining that Plaintiff's subjective complaints were not entirely consistent, the ALJ reviewed both the medical records—physical and psychological—as well as other evidence in the record, including Plaintiff's statements regarding her daily activities.[4] (Tr. 31-33).

---

[4] Plaintiff's argument appears to focus solely on the ALJ's determination of the Plaintiff's mental RFC, but this court must review the entire record to determine if the ALJ's decision is supported by substantial evidence. Accordingly, the ALJ's

Despite Plaintiff's claim that the ALJ found the Plaintiff's daily activities dispositive on the issue of whether Plaintiff was disabled, the ALJ first noted that Plaintiff's complaints were not entirely consistent with the medical records. (Tr. 31-32). The ALJ found that the medical records from Lakeview, specifically those of ARNP Sternung, showed that once Plaintiff's medication regimen was well-established, there was substantial improvement in Plaintiff's psychological symptomology from her initial in-take interview at Lakeview.[5] (Tr. 31). Indeed, in Plaintiff's initial medical treatment notes, ARNP Sternung noted that Plaintiff was suffering from "lots of hallucinations, delusions, mood swings, and paranoia." (Tr. 1096, 1099). From June 2015 through November 2015, Plaintiff described

---

finding that Plaintiff's subjective statements regarding her physical complaints were sometimes inconsistent with the medical record is supported by substantial evidence. Notably, Plaintiff did not provide evidence that she sought regular and persistent treatment for the alleged physical impairments for a substantial period after her release from prison. Dr. Phan's physical examination showed no evidence of severe impairments that limited her physical ability to perform activities such as walking, lifting her leg, and squatting. (Tr. 1071-75). Plaintiff also told Dr. Phan that her lower back pain was a 1/10, her knee pain was intermittent and at worst a 7/10, and that she simply took ibuprofen for the pain. (Tr. 1073). Plaintiff stated that "her physical issues," including her back and knee pain and diabetes "do not prevent her from working." (Tr. 237). Moreover, during the administrative hearing, Plaintiff testified that she had gotten her diabetes under control. (Tr. 51). Thus, there is substantial evidence discrediting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her physical symptoms.

[5] Plaintiff also argues that the ALJ's reliance on this improvement in Plaintiff's psychological symptomology was misplaced, which is discussed *infra* in part B2.

benefitting from her medications, including being able to handle stressors better and a reduction of her other symptoms. (Tr. 1118, 1120, 1123).

More recent medical treatment notes from Lakeview indicate that Plaintiff "reported no hallucinations or delusions" and that her memory was intact. (Tr. 1125, 1130, 1135, 1138). Further, ARNP Sternung noted that Plaintiff was at baseline on the psychotropic medication. (Tr. 1130). The medical treatment notes also indicate that the medication regimen managed Plaintiff's feelings of paranoia. (Tr. 1125, 1130, 1135, 1138). While Plaintiff stated she had "some feelings" of paranoia in June 2016, ARNP Sternung noted that Plaintiff's mood and behavior were otherwise stable. And the ALJ noted that ARNP Sternung stated that, to prevent relapse, the current medication regime should be continued. (Tr. 1130). Moreover, the records do not reflect that ARNP Sternung assigned a lower GAF score to the Plaintiff at any subsequent follow-up appointment.

Further, Plaintiff testified that her medication caused a lack of concentration and attention, made her groggy, sick, and gave her headaches. But ARNP Sternung's treatment notes do not mention any impairment in attention or concentration.[6] (Tr. 1125, 1130, 1135, 1138). In addition, the ALJ noted that Plaintiff's claim that her

---

[6]  In determining whether mental impairments are sufficiently severe to be *per se* disabling, the ALJ must consider the impact on four areas of life: (1) daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.

attention and concentration were impaired are contradicted by the notes from the counselor who conducted the Plaintiff's intake assessment, who noted that the Plaintiff's attention and concentration were "fair." (Tr. 926). Moreover, both consultative psychologists found that Plaintiff had only a moderate degree of difficulty in maintaining concentration, persistence, or pace. (Tr. 76, 86). Plaintiff's only reported side effects were some nausea and the sexual side effects caused by Celexa. (Tr. 1138).

The ALJ then used the Plaintiff's statements regarding her daily activities as further support for her decision that Plaintiff's subjective complaints were not entirely consistent with the evidence in the record. The ALJ noted that the Plaintiff testified she was scared to leave her room due to paranoia, isolations, auditory and visual hallucinations, and other symptoms and limitations. Plaintiff, however, testified she could go out shopping for food, which Plaintiff stated occurred bi-weekly. (Tr. 33, 51, 215). Plaintiff further reported that she could leave her house by herself.[7]  Plaintiff also noted that she lived and interacted with her cousin on a daily basis. (Tr. 209, 216).

---

[7] Although there is no indication of how frequently Plaintiff used public transportation, Plaintiff indicated that when she went out she used "public transportation" as a means of getting around. (Tr. 215). This also suggests that Plaintiff's subjective complaints may not be entirely credible.

Additionally, the ALJ noted that Plaintiff's daily activities also contradicted Plaintiff's claim that her medication caused limitations on Plaintiff's concentration and ability to sustain attention to a particular task. (Tr. 26). The ALJ noted the Plaintiff's testimony that she was able to shop for food, read, and play games. The ALJ concluded that these activities require a level of concentration and attention to complete. (Tr. 26, 33, 1130, 1132, 1133, 1134, 1135, 1138). The ALJ found this to be yet another reason to discredit Plaintiff's subjective testimony.

Plaintiff argues that *Turner v. Astrue* holds that a superficial review of a claimant's daily activity is not substantial evidence to discredit the claimant's subjective testimony or a basis for an adverse mental residual functional capacity. Specifically, the ALJ in *Turner* discredited a treating physician's testimony without good cause and did not take into consideration that certain home activities were not easily transferable to a work environment. *Turner v. Astrue*, No. 3:07-cv-482/MD, 2009 WL 210921, at *11 (N.D. Fla. Jan. 28, 2009) (citing *Reddick v. Charter*, 157 F.3d 715, 722 (9th Cir. 1998)). In *Turner*, the court noted that the ALJ disregarded a treating physician's opinion without good cause as well as relying on the daily activities, which were not inconsistent with the treating physician's opinion on the plaintiff's limitations. *Id.* As discussed more fully below, the present case is distinct from *Turner* in that the ALJ discussed Dr. Ludergnani's opinion in the Supplemental

Questionnaire as to Residual Functional Capacity and articulated a reason for assigning only partial weight to his opinion.

Although the ALJ in this case did consider Plaintiff's daily activities in her analysis of the Plaintiff's Mental Residual Capacity, the ALJ also considered the treatment notes and medical records signed by ARNP Sternung in determining that the Plaintiff's subjective testimony was not entirely credible. Accordingly, the ALJ's decision to discredit the Plaintiff's testimony was supported by substantial evidence in the medical records as well as the Plaintiff's testimony regarding her daily activities.

## B.  <u>Weighing the Opinions of Medical Experts</u>

Plaintiff also contends that the ALJ erred in assigning only partial weight to the opinion of Dr. Ludergnani and ARNP Sternung. Dr. Ludergnani and ARNP Sternung co-signed a Supplemental Questionnaire as to Residual Functional Capacity in which they opined that: (1) Plaintiff has moderate restriction on activities of daily living and marked difficult in maintaining social functioning; (2) frequent deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; (3) marked episodes of deterioration or decompensation in work or work-like setting; (4) marked limitations in her ability to understand, carry out, and remember instructions; (5) marked limitations in her ability to respond appropriately to supervision and to co-workers in a work setting;

and (6) marked limitations in performing simple and repetitive tasks in a work setting. They also opined that she likely would be absent from work 4 or more days each month. (Tr. 1116-17).

Plaintiff argues that the ALJ erred in assigning partial weight to this opinion because (1) the opinion was not an acceptable medical source; (2) the record reflects a period of improvement in Plaintiff's psychological conditions; and (3) the opinion was from a specialist (*i.e.* a psychiatrist) even though the opinion indicated a psychological evaluation was not obtained.

### 1. *Acceptable Medical Source*

In determining the weight of a medical opinion, an ALJ must consider several factors including: (1) whether the physician examined the claimant; (2) the treatment relationship; (3) the length of the treatment relationship and the frequency of examination, and (4) whether the medical opinion is from a specialist related to his area of specialty. *See* 20 C.F.R. § 416.927(c). Thus, the regulations make clear that the agency is entitled to give more weight to a treating physician's opinion than a medical professional who has never seen the SSI applicant in person. *See* 20 C.F.R. § 416.927(c)(2), (3). Indeed, the opinion of a one-time examiner is not entitled to great weight. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)).

While, "[t]he testimony of a treating physician must ordinarily be given substantial or considerable weight," an ALJ may discount the opinion if "good cause is shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Good cause exists for discounting a treating physician's report "when it is not accompanied by objective medical evidence or is wholly conclusory." *Crawford*, 363 F.3d at 1160 (quoting *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)). The Eleventh Circuit has also found that good cause for discounting a physician's opinion exists when the opinion is contradicted by the physician's own records. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004)) ("This Court has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."); *Crawford*, 363 F.3d at 1159-61 (holding that the claimant was not entitled to relief when several of the physicians' opinions were inconsistent with their treatment notes). Further, a physician's opinion that a claimant is disabled is not considered a medical opinion because it essentially would be an administrative finding that determines the ultimate issue of the case. 20 C.F.R. § 416.927(d); *Bell v. Bowen* 796 F.2d 1350, 1353-54 (11th Cir. 1986).

When an ALJ discounts a treating physician's opinion, he "must clearly articulate the reasons" for doing so. *Phillips*, 357 F.3d at 1240-41. When weighing different medical opinions, the "ALJ must state with particularity the weight given to each medical opinion and the reasons therefore." *Winschel*, 631 F.3d at 1179 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam)). As long as the ALJ articulates a specific justification for his decision, the district court will not second guess the ALJ's decision to reject a medical opinion for "good cause." *Hunter v. Comm'r of Soc. Sec. Admin.*, 808 F.3d 818, 823 (11th Cir. 2015).

The Plaintiff argues that the ALJ erred in discounting Dr. Ludergnani; however, the ALJ discussed the evidence that supported her conclusion that Dr. Ludergnani's opinion was entitled to only partial weight.

The ALJ explained that—in part—her decision was based on the fact that the record does not contain any evidence that Dr. Ludergnani ever personally examined or evaluated the claimant. (Tr. 29); *see* 20 C.F.R. § 416.927(c) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."); *McSwain*, 814 F.2d at 619 (holding that opinions of "one-time examiner" were not entitled to deference because they were not treating physicians.); *Grantham v. Colvin*, No. 3:15-cv-48/CJK, 2015 WL 8346897, at *5, 9 (N.D. Fla. Dec. 8, 2015) (holding that the ALJ committed no error in assigning a treating physician's opinion little weight

when the physician supervised the ARNP's treatment of claimant, only evaluated the claimant once, and the opinion was inconsistent with evidence in the record record), *aff'd sub nom. Grantham v. Acting Comm'r of the Soc. Sec. Admin*, 654 F. App'x 1015 (11th Cir. 2016). The ALJ noted that "although the document is counter-signed by Lakeview center staff psychiatrist Guido Ludergnani, M.D. . . . [and] it is likely that Dr. Ludergnani participated in the formulation and implementation of the [Plaintiff's] treatment plan," the treatment records show that the claimant was seen and evaluated at each visit by ARNP Sternung or a Licensed Practical Nurse ("LPN"). (Tr. 29).

A review of the Lakeview Center treatment records show that the Plaintiff was "scheduled for a psychiatric evaluation 12/9/14 with ARNP, Sternung." (Tr. 1065). The Recorded Service/Progress Note Report ("Report") was signed by ARNP Sternung and later authenticated by Dr. Ludergnani on December 12, 2014. (Tr. 1067-70). Each report created thereafter for Plaintiff's psychiatric follow up appointments was signed by ARNP Sternung (or LPN Pugh) and "authenticated" by Dr. Ludergnani *within a few days* of the appointment.[8] (Tr. 1096-97, 1099-00, 1104-05, 1118-22, 1125-26, 1130-31, 1135-39). The ALJ also noted that on the

---

[8] For example, on January 20, 2015, Plaintiff was evaluated for medication management. The document is signed by ARNP Sternung, and "authenticated" by Dr. Ludergnani on January 26, 2015. (Tr. 1096-97).

Supplemental Questionnaire as to Residual Functional Capacity, Dr. Ludergnani

indicated that he had not obtained a psychological evaluation of the Plaintiff.[9] (Tr.

1117).

Plaintiff has not attempted to show that Dr. Ludergnani ever personally

examined her. Instead, Plaintiff argues that it was improper to reject Dr.

Ludergnani's opinion because he provided treatment *through* ARNP Sternung.

(Doc. 6).

Some courts have concluded that when a doctor provides treatment through

the use of an ARNP, the ARNP and physician's co-signed opinion may be treated as

an acceptable medical source entitled to substantial weight. *Molina v. Astrue*, 674

F.3d 1104, 1111 (9th Cir. 2012) (holding that Ninth Circuit case law required that to

qualify a physician assistant's opinion as a medically acceptable treating source, the

claimant must show that the physician assistant worked under a physician's close

---

[9] An ALJ can elect to give only little weight to a physician who only examined a patient one time and simply restated a plaintiff's subjective complaints. *See Huntley v. Soc. Sec. Admin., Comm'r*, 683 F. App'x 830, 833 (11th Cir. 2017) (concluding that the ALJ was entitled to give little weight to physicians who were "one-time examiners" and who seemed merely to restate the plaintiff's subjective complaints without explanation). Here, Plaintiff's treatment records show that the review for disability was conducted on November 30, 2015, which was the same day that Plaintiff met with ARNP Sternung. (Tr. 1122-23). The treatment note indicates that Plaintiff related to ARNP Sternung her history of symptoms, particularly the ones she relied upon in making her claim for SSI. (Tr. 1123). Neither Dr. Ludergnani nor ARNP Sternung explained their determinations, and their determination simply repeat what Plaintiff related to ARNP Sternung.

supervision)[10]; *Perrigin v. Colvin*, No. 1:15-cv-552-GMB, 2016 WL 7256952, at *3 (M.D. Ala. Dec. 15, 2016); *King v. Astrue*, 493 F. Supp.2d 1232, 1234 (S.D. Ala. 2007). Plaintiff, however, has not provided—nor can this court find—an Eleventh Circuit case that controls this issue. Instead, Plaintiff relies on cases from the Northern and Southern District of Alabama to persuade the court to adopt a view that a co-signed statement by an ARNP and Physician regarding the claimant's impairments may be treated as an acceptable medical opinion when a physician oversees the treatment.[11]

For example, Plaintiff cites *Perrigin v. Colvin*, No. 1:15-cv-552-GMB, 2016 WL 7256952, at *3 (M.D. Ala. Dec. 15, 2016). There, the ALJ weighed several sources of opinion evidence including a Medical Source Statement completed by a treating nurse practitioner and signed by a physician. The ALJ in *Perrigin* gave the nurse practitioner's opinion "no weight" because a nurse practitioner was not an

---

[10] Notably, the court in *Molina* relied on Ninth Circuit precedent that relied on 20 C.F.R. § 416.913(a)(6), which stated that "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." This section of the regulation has been repealed, however. The Ninth Circuit did not discuss the validity of its prior precedent in light of this repeal.

[11] The undersigned notes that, although these decisions are persuasive, they are not binding. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) (holding "[a] district court is not bound by another district court's decision, or even an opinion by another judge of the same district court, but a district court in this circuit is bound by [the Eleventh Circuit Court's] decisions.").

"acceptable medical source" and "was not consistent with the treatment evidence," but did not elaborate on his reasoning for giving the Medical Source Statement no weight. *Id.* The district judge found that the ALJ had committed error by failing to *assign any weight* to the medical source statement and that the ALJ's conclusory statement was insufficient to meet the good cause standard. *Id.* at 3-4.

Similarly, the Plaintiff cites *King v. Astrue*, 493 F. Supp.2d 1232 (S.D. Ala. 2007). In that case, the ALJ rejected a Residual Functional Capacity Questionnaire completed by a nurse practitioner and a supervising physician. *Id.* at 1234 ("The ALJ rejected the report because the claimant's [former] counsel acknowledge at the hearing that . . . a non-physician, had completed the form and the claimant had not been seen by a medical Physician . . . . Further, the [non-physician] was 'not an acceptable medical source to render such an opinion . . . .'"). The district judge rejected the commissioner's argument that the ALJ had committed harmless error because the ALJ "made a conscious decision to ignore the [physician's] signature" on the report and a doctor is responsible for his signature on medical documents. *Id*.

But unlike the cases cited by the Plaintiff, the ALJ in this case did not entirely discount Dr. Ludergnani's or ARNP Sternung's opinions. The ALJ considered the Supplemental Report and determined that it was entitled to partial weight rather than controlling or substantial weight. (Tr. 29). Further, the ALJ explicitly referenced Doctor Ludergnani's signature and noted that Doctor Ludergnani "likely

participated in the formulation and implementation of the claimant's treatment plan at the Lakeview Center." (Tr. 29). She determined, however, that the Supplemental Report was entitled to less weight because Dr. Ludergnani had not personally examined or evaluated the patient. (Tr. 29).

This is consistent with the relevant regulation, which states: "Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." 20 C.F.R. § 416.927(c). This is also consistent with controlling Eleventh Circuit law. *See McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (holding that opinion of one-time examiner is not entitled to great weight); *see also Grantham*, 654 F. App'x at 1016 (finding no error when a doctor supervised the ARNP's treatment of claimant and only examined the claimant once before the physician was deposed); *Milner v. Barnhart*, 275 F. App'x. 947, 948 (11th Cir. 2008) (concluding that the ALJ did not err when he accorded little weight to a physician who treated the plaintiff only once); *Nichols v. Comm'r of Soc. Sec. Admin.*, 260 F. Supp.2d 1057, 1066 (D. Kan. 2003) (holding that the ALJ was not required to treat the opinion of a nurse practitioner as that of a treating physician, even though a physician had signed the medical records); *Hudson v. Astrue*, No. CV-11-0025, 2012 WL 5328786, at *4 (E.D. Wash. Oct. 29, 2012) (holding that the ALJ committed no error in determining that a physician was not a treating physician when the physician adopted the opinion of an associate and

there was no evidence that the physician "observed, examined, or treated the plaintiff").

Finally, the ALJ did conclude that ARNP Sternung's opinion was entitled to some weight, but not entitled to *controlling* evidentiary weight because Sternung was a nurse practitioner. (Tr. 30). This is consistent with the regulations and case law. *See* 20 C.F.R. § 416.913(d)(1); SSR 06-03P (S.S.A. Aug. 9, 2006);[12] *Clerjeaux v. Colvin*, No. 15-14137-CIV, 2016 WL 7470008, at *2 (S.D. Fla. Aug. 8, 2016) (concluding that ALJ correctly that the nurse practitioner's opinion is not entitled to the special consideration accorded to acceptable medical sources); *King*, 493 F. Supp.2d at 1234. Thus, unlike the ALJs in *King* and *Perrigin*, the ALJ in the present case reviewed ARNP Sternung's treatment notes when determining the severity of the Plaintiff's impairments and how it impacted her ability to work. (Tr. 31-32). This is consistent with the regulations. *See* 20 C.F.R. § 404.1513(d)(1); *King*, 493 F. Supp at 1234 (holding that even though the ALJ concluded that the nurse practitioner was not an acceptable medical source, the ALJ erred in rejecting the nurse practitioner's opinion because under the regulations it was an acceptable source to show the severity of the claimant's impairments). Here, the ALJ found that ARNP's Sternung

---

[12] SSR 06-03P includes nurse practitioner in its definition of "medical sources who are not 'acceptable medical sources.'"

treatment notes were consistent with the Plaintiff's mental Residual Functional Capacity. (Tr. 28). Plaintiff has failed to show that the ALJ erred.

### 2.   *Plaintiff's Positive Response to Medication*

The ALJ further stated that she gave the Supplemental Questionnaire less weight because Plaintiff improved when she took her medication, as noted by ARNP's Sternung's treatment notes. (Tr. 30). As discussed above, a nurse practitioner's opinion is not entitled to controlling weight, but the ALJ must still consider opinions from nurse practitioners for information relating to severity of an impairment and the effects the impairment has on the claimant's ability to work. *See* 20 C.F.R. § 416.913(d)(1). This is what the ALJ did here.

Unlike a determination of disability based on physical impairments, symptom-free periods do not necessarily compel a finding that plaintiff is not disabled due to her mental impairments. *Mace v. Comm'r, Soc. Sec. Admin*, 605 F. App'x 837, 843 (11th Cir. 2015); *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986) (citing *Lebus v. Harris*, 526 F. Supp. 56, 61 (N.D. Cal. 1981)); *Williams v. Apfel*, 73 F. Supp.2d 1325, 1341 (M.D. Fla. 1999); *see Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (noting that a person with a mental impairment that responds to treatment erratically may have better days and worse days, which would make it impossible to hold down a full-time job). Thus, the ALJ must determine whether the claimant based on the mental impairments can "maintain the job for a

significant period of time." *Singletary*, 798 F.2d at 822; *Williams*, 73 F. Supp.2d at 1341.

The ALJ properly relied on ARNP Sternung's findings on the Plaintiff's mental status in determining the severity, persistence, and effects of Plaintiff's condition. (Tr. 28-29). The ALJ concluded that ARNP Sternung's treatment notes were consistent with the RFC found by the ALJ. (Tr. 28-29). The ALJ, however, only gave partial weight to ARNP's Sternung opinion in the supplemental questionnaire because ARNP Sternung's opinion was inconsistent with his treatment notes, which showed that Plaintiff's symptoms were gradually improving. (Tr. 30); *see Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (noting that good cause exists to discount a physician's opinion when the opinion is contradicted by the physician's own records); *Grantham*, 654 F. App'x. at 1016 (holding that the ALJ did not err in discounting a physician's opinion when the physician only supervised the claimant's care provided by a nurse practitioner, had examined the claimant once before being deposed, and whose opinion was inconsistent with other parts of the record, including treatment notes from the facility).

Specifically, the ALJ discussed that when Plaintiff went to Lakeview in October 2014, Plaintiff reported that she suffered from several mental health problems. By December 2015, Plaintiff show signed of improvement in light of the

medication regimen she was following. In more recent evaluations by ARNP Sternung, Plaintiff reported that she did not have major depressive episodes, hallucinations, or paranoia. (Tr. 1125, 1130, 1138). Plaintiff was also observed to be cooperative and engaged in the conversation. She did not demonstrate psychomotor agitation or retardation. ARNP Sternung also noted that Plaintiff's thought content revealed no evidence of auditory or visual hallucinations, delusions, or paranoia, and no loose associations, tangentially, or circumstantiality. (Tr. 1130, 1135, 1138).

Although Plaintiff reported some paranoia at the June 13, 2016, appointment, ARNP Sternung noted that Plaintiff had otherwise stable moods and behaviors. (Tr. 1135). Additionally, ARNP Sternung observed that Plaintiff did not exhibit psychomotor agitation and her thought content "revealed no evidence of auditory or visual hallucinations, delusions or paranoia, and no loose associations, tangentiality, or circumstantiality." (*id.*). ARNP Sternung made the same observations regarding Plaintiff at the follow up appointment on July 14, 2016, and Plaintiff did not mention any feelings of paranoia. (Tr. 1138). Additionally, ARNP Sternung assigned Plaintiff a GAF Score of 61 on three separate occasions.[13] (Tr. 1070, 1097, 1100).

---

[13] Although the ALJ gave the GAF score little weight, the ALJ noted that such a score indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." (Tr. 29) (quoting Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32, 4th ed., 2000).

The ALJ also noted that in the more recent evaluations, ARNP Sternung's notes consistently indicate that Plaintiff's memory was intact. (Tr. 1125, 1130, 1135, 1138). ARNP Sternung's notes also never mention any limitation on concentration, attention, and pace. In addition, the ALJ also considered Dr. Phan's opinion that Plaintiff could follow simple directions. Thus, ARNP Sternung's treatment notes, supported by Dr. Phan's opinion, suggest that Plaintiff's concentration, persistence, and pace are not as limited as ARNP Sternung stated in the supplemental questionnaire. Although state consultants are not sufficient alone to provide substantial evidence, the state consultants also opined that Plaintiff had only a moderate degree of difficulty in maintaining concentration, persistence, or pace. (Tr. 76, 86).

Plaintiff relies on *Williams v. Apfel*, 73 F. Supp.2d 1325 (1999), for the proposition that a period of reduced symptom or being symptom free is insufficient to discredit a treating physician's opinion. (Doc. 6 at 13). Notably, in *Williams* the court noted that the treating physicians' treatment notes indicated that the plaintiff had suffered repeated episodes of deterioration from February 1992 through November 1993. Indeed, there was only one treatment note that indicated that the plaintiff appeared to be symptom free in the whole year. *Id.* at 1340.

In this case, the ALJ noted that ARNP Sternung's notes documented several times that Plaintiff either exhibited no hallucinations, tangential thinking, or

paranoia or the Plaintiff stated that she did not have those symptoms. Plaintiff related that the medication was causing gradual improvement and that it was helping her handle stressors better. (Tr. 1120, 1125). Further, in March 2016, ARNP Sternung noted that Plaintiff appeared to be baseline and had no hallucinations, no paranoia, and no delusions. (Tr. 1135). While Plaintiff experienced "some paranoia" in June 2016, the Plaintiff continued to exhibit improvement in her behavior, moods, and other symptoms. (Tr. 1135, 1138).

Considering all the evidence of the record, particularly that there is no evidence in the record that Dr. Ludergnani examined or evaluated the Plaintiff in person and his opinion was inconsistent with other evidence in the record, including treatment notes of ARNP Sternung, the undersigned finds that the ALJ committed no error in assigning only partial weight to Dr. Ludergnani's opinion. *See Evans v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 521, 524 (11th Cir. 2014) (concluding that "substantial evidence supports the ALJ's discrediting of [a treating physician's] medical opinion. First, [his] opinion that Evans suffered from multiple marketed and extreme mental limitations was not supported by his own medical findings regarding the severity and risk levels . . . Second, it was inconsistent with the opinions of three other physicians that concluded Evan's mental impairments were not severe . . . Finally, [his] opinion was contradicted by Evan's self-reported activities, which

included various household chores, light yard work, driving, shopping, visiting with friends and family, and playing chess.").

## VI.   Conclusion

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, the undersigned respectfully **RECOMMENDS** that:

1.     The decision of the Commissioner be **AFFIRMED**, and that this action be **DISMISSED**.

2.     JUDGMENT be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner,

3.     That the Clerk of the Court be directed to close the case file.

At Panama City, Florida, this <u>19</u>th day of February, 2019.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.